NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0330n.06
Case No. 25-6003

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

TIFFANY BARRINGER, as Mother, Next of
Kin, and as the Administrator of the Estate of
Peyton Barringer,

        Plaintiff-Appellant,

v.

SARA A. JONES,

        Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jul 22, 2026
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
TENNESSEE

OPINION

---

Before: KETHLEDGE, NALBANDIAN, and HERMANDORFER, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Tiffany Barringer's 18-year-old son, Peyton, took his own life while at the home of his father and his stepmother, Sara Jones. Though Peyton's father and stepmother knew that Peyton had previously tried to commit suicide, neither secured a rifle and ammunition that were in their home. After Peyton used the rifle to kill himself, Barringer sued Sara in a wrongful death action.

Sara moved for summary judgment, arguing that Barringer couldn't establish proximate cause as a matter of law. The district court agreed that Peyton's suicide wasn't reasonably foreseeable and granted the motion. We agree with the district court and affirm.

**I.**

Peyton was the biological son of Tiffany Barringer and Shawn Jones. He lived with his mother in Georgia, where he attended high school, and regularly visited Shawn and Sara Jones,

his stepmother, in Tennessee. Peyton was a troubled young man with a history of mental health struggles and suicidal ideations. And at the time of his death, he was only 18 years old.

In October 2021, he attempted to take his own life by overdosing on insulin that he was required to take for his newly diagnosed diabetes. Two months later, Peyton told his father about his suicide attempt, who then told Barringer and Sara. The three of them later discussed what they should do to help Peyton. They put in place a routine where Peyton would administer his insulin injections during dinner in the presence of Shawn, who also took insulin, and Sara. As Sara testified later, they instituted this routine "because [Peyton] was suicidal." R.34-1, Sara Jones Dep., PageID 316. Peyton also began going to therapy. Sara knew about Peyton's ongoing therapy, sometimes helping with the scheduling of appointments.

Peyton and Sara had a "generally [] positive relationship." *Id.* at 229. They'd often cook together, go to the movies, or play card games or video games. *Id.* Peyton was fairly reserved toward his stepmother when it came to his mental health and didn't share with her the things that were troubling him. But Sara recognized that "he might be at risk for suicide" and that he was generally overwhelmed by life. *Id.* at PageID 314–15. During the time between Peyton's October suicide attempt and his death, Sara observed Peyton's poor sleeping patterns, which she noted were "identical" to his sleeping patterns immediately before his earlier suicide attempt. *Id.* at PageID 264. And she took his sleeping patterns—inability to sleep at night, sleeping most of the day—as signs that he was "very depressed." *Id.* at PageID 241–42. As had been the case for many years, Shawn owned a .22 caliber rifle that he kept unsecured in his home, with ammunition for the rifle also in the home. And Sara was aware of this.

On November 7, 2022, Peyton was staying with Shawn and Sara at their Tennessee home. To Sara, November 7 seemed like a normal night. She brought Peyton dinner, she showed him a

new rug, and they had a normal conversation—discussing Peyton's new alarm clock and his therapy appointment the next day. But she didn't see Peyton take his insulin that day and wasn't sure if Shawn, who had been away the whole day for work and didn't return home until late in the evening, carried out their routine either. Still, she didn't observe any unusual behavior from Peyton and wasn't fearful that he would attempt suicide. Tragically, sometime between the evening of November 7 and the next morning, Peyton used his father's rifle to take his own life.

At some point after Peyton's death, Sara deleted all her text messages with Peyton, which were never recovered. But she didn't delete her messages with anybody else.

Barringer then brought a wrongful death claim against Sara, alleging that Sara's negligence led to Peyton's access to the unsecured rifle and ammunition. Sara moved for summary judgment and argued that Barringer couldn't prevail as a matter of law on the proximate-cause element of her claim. In Sara's view, Peyton's suicide was a superseding cause that cut off her liability. Barringer responded by arguing that, based on the relationship between Sara and Peyton and the foreseeability of Peyton's suicide, Sara wasn't entitled to judgment as a matter of law. The district court agreed with Sara and granted her summary judgment, finding that Peyton's suicide wasn't reasonably foreseeable to her. Barringer now appeals and asks us to reverse the district court's decision.

## II.

Because this case comes to us on diversity jurisdiction, "state law governs substantive issues and federal law governs procedural issues." *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 613 (6th Cir. 2024). Here, Tennessee law governs the substantive issues. And because summary judgment is a procedural question, the federal summary-judgment standard controls. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).

We review a district court's summary-judgment grant de novo. *Barr v. Lafon*, 538 F.3d 554, 561 (6th Cir. 2008). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating the movant's entitlement to judgment, we don't weigh the evidence or make credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, we must draw reasonable inferences from the evidence in the nonmovant's favor. *Id.* And though we don't make credibility determinations, the nonmovant must do more than merely raise "the prospect of challenging a witness's credibility" to make a witness's credibility genuinely disputed. *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) (citation modified). The nonmovant must "offer[] specific facts that call into question the credibility" of the witness. *Id.* (citation modified).

The movant has the "initial burden of showing 'the absence of a genuine issue of material fact,'" which may be met by pointing out to the court that the nonmovant has no evidence to support an essential element of her case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Then the nonmovant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Barr*, 538 F.3d at 561–62 (quoting *Celotex Corp.*, 477 U.S. at 322–23).

### III.

Barringer argues that genuine issues of material fact remain regarding proximate cause—whether Sara should've viewed Peyton's suicide as a reasonably foreseeable probability. But we agree with the district court that the evidence doesn't support the contention that Sara should've

perceived Peyton as actively contemplating suicide at the time she was allegedly negligent. And the special-relationship exception to Tennessee's suicide rule doesn't apply on this case's facts.

**A.**

To prove negligence in a wrongful death action under Tennessee law, the plaintiff must establish (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) an injury, (4) factual cause, and (5) proximate, or legal, cause. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). This appeal requires us to address only the last element: proximate cause.

To satisfy proximate cause, the plaintiff must prove that "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence."[1] *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). In other words, "the plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility." *King v. Anderson County*, 419 S.W.3d 232, 248 (Tenn. 2013) (citation modified). At the same time, the plaintiff needn't show that the defendant should've "foresee[n] the exact manner in which the injury [took] place." *McClenahan*, 806 S.W.2d at 775. The defendant need only have reasonably foreseen "the general manner in which the injury or loss occurred," *id.*, where the injury or loss was "of the type to be expected" from the alleged negligence, *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005).

The defendant can defeat the plaintiff's showing of proximate cause by establishing a superseding cause, which is "an intervening force or act that is deemed sufficient to prevent

---

[1] The plaintiff must also prove that: "(1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991).

liability for an actor whose tortious conduct was a factual cause of harm." *Cotten v. Wilson*, 576 S.W.3d 626, 639 (Tenn. 2019) (citation modified). For the defense to succeed, "the superseding cause must not have been reasonably foreseen by the original negligent party."[2] *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 299 (Tenn. 2017) (citation modified). And for both the plaintiff's prima facie claim and the superseding cause, foreseeability is measured "as of the time of the acts or omissions claimed to be negligent." *King*, 419 S.W.3d at 248.

*Cotten v. Wilson* is the leading Tennessee decision involving suicide as the intervening act. As described in that case, Tennessee (like many states) was long "reluctant to recognize suicide as a proximate consequence of a defendant's wrongful act." *Cotten*, 576 S.W.3d at 639 (quoting *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir. 1990)). Reflecting this reluctance, Tennessee adopted a strict bar against liability in what is called the "suicide rule": "[S]uicide will be deemed a superseding cause of death if it was a willful, calculated, and deliberate act of one who has the power of choice." *Id.* (citation modified).

But this firm stance has softened. Over time, Tennessee courts recognized exceptions to the suicide rule, like the special-relationship exception. *See id.* at 643–44. And the Tennessee Supreme Court ultimately realigned suicide cases with general tort law by refocusing the inquiry on whether the suicide was reasonably foreseeable. *Id.* at 647–48. So despite the exceptions, *Cotten* made clear that the plaintiff's claim needn't fit into one. *Id.* at 647. The "touchstone is foreseeability, not whether a given case fits into a previously carved-out exception." *Id.* (citation

---

[2] The superseding-cause defense has three other elements as well: "(1) the harmful effects of the superseding cause must have occurred after the original negligence; (2) the superseding cause must not have been brought about by the original negligence; [and] (3) the superseding cause must actively work to bring about a result which would not have followed from the original negligence." *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 299 (Tenn. 2017) (citation modified).

modified). And the "crucial inquiry is whether the defendant's negligent conduct led to or made it reasonably foreseeable that the deceased would commit suicide." *Id.* (citation modified).

Still, the reasons why Tennessee first adopted the suicide rule remain relevant. *Id.* Because "a negligent actor has much less reason to anticipate intentional misconduct than negligence," Tennessee courts require "solid evidence in the record that the decedent's suicide was a reasonably foreseeable probability resulting from the defendant's conduct." *Id.* at 647–48 (citation modified). And the mere fact that the decedent attempted suicide previously, though relevant, doesn't invariably establish proximate cause. *See id.* at 651. Rather, the Tennessee Supreme Court has asked whether the defendant should've perceived the decedent "as having an outsized, suicidal response to the various stressors" in life—in other words, an acute suicidal frame of mind or active contemplation of suicide contemporaneous with the alleged negligence. *Id.* If the plaintiff can make that showing, then the suicide was reasonably foreseeable to the defendant and not just a remote possibility.

Generally, in Tennessee, the superseding-cause defense is an affirmative defense—the defendant bears the burden of proof at trial. *Davis v. McGuigan*, 325 S.W.3d 149, 160–61 (Tenn. 2010); *see also Cotten*, 576 S.W.3d at 639. But when the superseding cause is a suicide, the defense operates differently. To establish proximate cause, the plaintiff must prove that the *injury* was reasonably foreseeable. *King*, 419 S.W.3d at 248. And to establish a superseding cause, the defendant must prove that the *intervening act* was not reasonably foreseeable. *Borne*, 532 S.W.3d at 299. In suicide cases, however, the injury and intervening act are one and the same. So the inquiry collapses into whether the plaintiff can show that the suicide was reasonably foreseeable. Put differently, what would otherwise be an affirmative defense operates as a negation of the

plaintiff's showing of proximate cause.[3]  *See, e.g.*, *Cotten*, 576 S.W.3d at 651 n.27 (placing the burden on the plaintiff to establish the foreseeability of the suicide to prevail against the defendant's summary-judgment motion).

Finally, because *Cotten* bears material resemblances to the facts here and is the most recent Tennessee Supreme Court decision on the foreseeability of suicide, it's worth exploring that case in detail before turning to our case's facts.  There, the decedent Christina Cotten was involved in an intermittent romantic relationship with the defendant, who was a psychiatrist.  *Id.* at 629–32. The defendant knew that Cotten suffered from depression and was under the psychiatric care of another doctor.  He knew that she had attempted to commit suicide in January 2014.  *Id.* at 630– 31.  And he knew that she had been distressed about losing majority parenting time with her son. *Id.* at 631.  Cotten and the defendant lived together from October 2013 to August 2014.  *Id.* at 629, 631.  The defendant broke up with her in August and Cotten moved out, but the two continued to have an on-and-off relationship.  *Id.* at 631.  The defendant possessed a revolver, which he kept concealed but unsecured in a drawer in his home.  *Id.* at 631–32.  He showed Cotten the revolver once in October 2014, and, that same day, he told Cotten that he wanted to see another woman. *Id.* at 632.  Cotten abruptly stormed out of the house, but she and the defendant continued to talk in the days that followed and raised the possibility of reconciling.  *Id.*

Then in November, Cotten asked the defendant, who was out of town on a business trip, if she could stay at his house because she'd been evicted.  *Id.* at 633.  He agreed, and four days later he returned to his house while Cotten was still staying there.  *Id.*  Both spent that night at the house,

---

[3]  This matters for our review of Sara's summary-judgment motion because if the burden were on her to prove that the suicide wasn't reasonably foreseeable, Barringer could in theory defeat her motion by demonstrating an absence of evidence.  *See Barr*, 538 F.3d at 562; *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002).

and the next morning, November 6, the defendant left to visit his parents. *Id.* When he left, Cotten seemed to be in good spirits, and the two exchanged pleasant text messages while he was gone. *Id.* But when he returned on November 9, he found Cotten unconscious from a self-inflicted gunshot wound and his loaded revolver close by.

On these facts, the Tennessee Supreme Court found that, despite the defendant's awareness of Cotten's earlier suicide attempt and ongoing mental health issues, there wasn't evidence that Cotten's suicide was a reasonably foreseeable probability at the time of the allegedly negligent acts. *Id.* at 653. The court found that there were no facts in the record showing that the defendant "should have seen [Cotten] as having an outsized, suicidal response to the various stressors in her life." *Id.* at 651. Both times the defendant broke up with Cotten, her reaction was negative but "not a disproportionate response." *Id.* In sum, despite his awareness of accumulating stressors in Cotten's life after her suicide attempt (like her eviction and the loss of parenting time with her son), the evidence didn't indicate that he should've been aware of her "suicidal frame of mind" when Cotten stayed at his house with an unsecured gun in November—ten months after her suicide attempt. *Id.* at 651, 653. And though the plaintiff's claim included allegations of negligent acts from January to November 2014, the court identified the several days in November when Cotten was staying at the defendant's house as the relevant point in time to evaluate foreseeability. *See id.* at 635 n.15, 651, 653.

In reaching this conclusion, the court distinguished an out-of-state case, *Delaney v. Reynolds*, 825 N.E.2d 554 (Mass. Ct. App. 2005). In *Delaney*, the plaintiff, who lived with the defendant (her boyfriend), survived her self-inflicted gunshot wound. *Cotten*, 576 S.W.3d at 653 n.29. The defendant knew that the plaintiff had previously attempted to commit suicide and that, at the time of her self-inflicted injury, she was actively considering suicide. *Id.* In the month

leading to her injury, she twice told the defendant that she wanted to end her life. *Id.* And in one of those instances, the defendant handed her his gun and instructed her "to go outside so as not to make a mess in his house." *Id.* (citation modified). Though *Cotten* didn't indicate that *Delaney* was the floor for proving the foreseeability of a suicide, it used *Delaney* to illustrate the acute suicidality that would make a suicide reasonably foreseeable. *See id.*

**B.**

**1.**

Turning to this case, we'll start by addressing the foreseeability of Peyton's suicide. And, as a preliminary matter, we'll address Sara's deletion of all her text messages with Peyton shortly after his death, because this issue frames how we view Sara's testimony. We agree with Barringer's contention that the deletion is a specific fact that undermines the credibility of Sara's testimony. *See Goodwin*, 781 F.3d at 322–23 (finding that the plaintiffs put a police officer's credibility at issue because, among other things, the officer had a pattern of not activating his body camera). So a jury could choose to disbelieve her.

But because Barringer has the burden of showing proximate cause, a jury's ability to disbelieve Sara doesn't preclude summary judgment. When the nonmovant would bear the burden of proof on an issue at trial, she must "present affirmative evidence in order to defeat . . . summary judgment . . . even where the evidence is likely to be within the possession of the defendant." *Anderson*, 477 U.S. at 257. And though the deletion allows the jury to disbelieve Sara, it doesn't create a dispute about what the text messages said or represent affirmative evidence bearing on the foreseeability of Peyton's suicide. *See, e.g.*, *Street*, 886 F.2d at 1479 (plaintiff "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" to preclude summary judgment). Discrediting Sara's testimony tells us nothing affirmatively about what was

in the texts—it just means that we can't rely on her word that there was nothing there. But that's not enough.

So the jury can't infer, from the deletion alone, something specific like that Peyton expressed suicidal ideation in the texts or communicated distress that would have put Sara on notice under the foreseeability standard. And considering Sara's statement that nothing was unusual on November 7, the deletion doesn't show that things weren't normal that evening. *See Anderson*, 477 U.S. at 256–57 ("Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion." (citation modified)).

With that, we turn to the affirmative evidence that Barringer presents. It's undisputed that Sara knew of Peyton's prior insulin overdose and his ongoing mental health treatment, and that she regarded Peyton as a suicide risk in a general sense. But *Cotten* held that similar knowledge—there, knowledge of an attempt ten months earlier, coupled with continuing awareness of depression, treatment, and accumulating life stressors—doesn't make a later suicide a foreseeable probability. *See Cotten*, 576 S.W.3d at 651–53.

To be sure, the evidence here goes beyond what the plaintiff in *Cotten* had. Barringer also points to the insulin-supervision routine and Peyton's poor sleep regimen leading up to his death. Shawn and Sara had Peyton administer his insulin at dinner in their presence, Sara testified that they began the practice "because he was suicidal," and they generally maintained the practice as a daily routine when Peyton visited (excluding November 7 itself). R.34-1, PageID 316. Also, Sara testified that Peyton had trouble sleeping throughout 2022 and leading up to his death, which was "identical" to what Peyton experienced in 2021 before his earlier suicide attempt. *Id.* at PageID 264. And Sara acknowledged that she took Peyton's sleep problems as indicating that he was

"very depressed." *Id.* at PageID 242. This evidence, Barringer contends, supplies the perception of an acute risk that the *Cotten* record lacked.

We disagree. First, though the defendant in *Cotten* knew about the life stressors that were accumulating in the decedent's life between her suicide attempt and her death, there's no evidence that Sara knew whether there was a similar accumulation of stressors for Peyton. This lack of evidence decreases the foreseeability of suicide relative to the record in *Cotten*, despite Sara's acknowledgment that Peyton, having recently attempted suicide, was a suicide risk in a general sense. But this difference carries little weight. It's the perception of Peyton's mental state (his response to life's stressors) rather than the accumulation of stressors in and of itself that's important. *See Cotten*, 576 S.W.3d at 651.

Second, and more importantly, we aren't persuaded that the insulin-supervision routine and Peyton's sleeping pattern bear the weight Barringer places on them under Tennessee law. The routine demonstrates that Sara was aware of the means that Peyton used to carry out his first suicide attempt and that she perceived a lingering, appreciable risk of suicide that continued until the night of his death. Though *Cotten* didn't involve an ongoing suicide-mitigating routine like what's present here, the insulin routine still doesn't allow for the inference that *Cotten* requires. The routine isn't a fact showing that Sara should've perceived that Peyton was actively contemplating suicide during the relevant period—November 7.[4]

Though Peyton's loved ones instituted the routine months earlier "because he was suicidal," that doesn't reveal that Sara perceived Peyton as suicidal a year after his past suicide attempt and diabetes diagnosis. R.34-1, PageID 316. What's more, taking the view that Sara's

---

[4] As in *Cotten*, we limit our analysis of the defendant's perception of suicide risk to when the decedent's exposure to the negligence allegedly brought about the suicide, despite the alleged negligent acts extending over a longer period of time. *See Cotten*, 576 S.W.3d at 635 n.15, 651.

ongoing precaution against suicide reflected a perception of an acute suicide risk would collapse *Cotten*'s distinction between knowledge of a past suicide attempt and perception of present risk when the alleged negligence occurs. *See Cotten*, 576 S.W.3d at 653.

Implicit in *Cotten*'s reasoning is the assumption that the more time that passes after a suicide attempt (at least where the person is also receiving treatment), the less foreseeable a suicide becomes to others. *See id.* at 651. Whether that assumption is always sound, we cannot say. In the context of the insulin routine, that routine was put in place when the perception of the foreseeability of Peyton's suicide was at or near its peak—he had just made an attempt. But the maintenance of that routine doesn't show that Sara's perception of the suicide risk remained the same as when they first put the routine in place.

And a similar point applies to Sara's observation of Peyton's consistently poor sleep patterns from 2021 to 2022. This evidence suggests apparent stability in Peyton's mental condition. True, as Sara observed, it was a stable condition of depression. But that state of mind doesn't show an elevated and present risk of suicide such that Sara should've perceived Peyton as actively contemplating suicide.

So Barringer's pieces of evidence—the knowledge of Peyton's suicide attempt, the knowledge of his ongoing mental health treatment, the insulin-supervision routine, and the poor sleep regimen—are cumulative of the same inference. That is, Sara perceived a lingering, appreciable risk of suicide that remained stable, not an acute suicidal response or active contemplation of suicide. *See id.* And unlike the defendant in *Cotten*, Sara wasn't aware of any accumulating life stressors. *See id.* at 631–33. So the evidence doesn't push the foreseeability of Peyton's suicide from being a possibility to being reasonably foreseeable as a probability. *See id.*

at 647. As a matter of law, the evidence falls short of permitting a rational jury to find proximate cause.

**2.**

Finally, we'll turn to Barringer's argument that the special-relationship exception to the suicide rule applies. The exception applies where the defendant "had a special relationship, often of a medical nature, with the decedent."[5] *Cotten*, 576 S.W.3d at 643–44 (citation modified).

*Cotten* confirmed the shift to foreseeability of the suicide as the touchstone inquiry for proximate cause. *Id.* at 647. In this way, the "exceptions" label is a lag in vocabulary. Plaintiffs no longer need to identify an exception to the suicide rule because the suicide rule is effectively defunct. But *Cotten* left the exceptions in place, leaving open a route for plaintiffs to establish their claims by relying on factually similar cases that recognized or applied the exceptions. The exceptions are, in effect, held in stasis. That's why *Cotten* evaluated the applicability of the exceptions to the facts before it and not only declined to recognize a new "special relationship," but refused to engage at all in analyzing whether the plaintiff's proffered new "special relationship" outside the medical context should be recognized. *Id.* at 649 n.25.

Barringer argues that the special-relationship exception is more expansive than we describe. She points to the non-medical special relationships that Tennessee courts recognize when determining whether a defendant owed an affirmative duty of care to a plaintiff. *See Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) ("We have previously recognized such special relationships to include those of innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another.");

---

[5] Though *Cotten* qualified its description of the exception by noting that the relationship is "often" of a medical nature, we can find no case where the exception applied outside the medical context when assessing proximate cause in suicide cases.

*Biscan v. Brown*, 160 S.W.3d 462, 479 (Tenn. 2005) ("The special relationship doctrine carves out an exception to the general rule that there is no duty to act for the protection of a third party . . . [and] recognizes that certain socially recognized relations exist which constitute the basis for such legal duty." (citation modified)).  But her argument ignores the role that the special-relationship exception played as courts chipped away at the suicide rule—avoiding that rule's absolute bar on proving *proximate cause*—and *Cotten*'s confirmation that, going forward, foreseeability is the touchstone inquiry.  In suicide cases, the special-relationship exception is cabined to medical relationships, and, as in *Cotten*, we won't assess whether non-medical relationships should be added to the exception.

That leaves us with the special relationships that Barringer puts forward.  She presents two theories on the applicability of the exception:  the particular stepmother-stepson relationship that Peyton and Sara had, and a homeowner-household member relationship.  But neither relationship fits as a medical relationship and, as such, neither fits within the special-relationship exception in this context.  So Barringer cannot employ the exception to establish proximate cause.

**IV.**

Because Barringer cannot establish proximate cause as a matter of law, we affirm the district court's grant of summary judgment.